**UNITED STATES of America ex rel. Andrew PERRY, Petitioner-Respondent,**

v.

**William F. MULLIGAN, Chief Probation Officer for Essex County, New Jersey, Respondent-Appellant.**

No. 75–2332.

United States Court of Appeals, Third Circuit.

Argued Sept. 10, 1976.

Decided Nov. 5, 1976.

Joseph P. Lordi, Essex County Prosecutor, Kenneth Ply, Asst. Prosecutor, Newark, N.J., for respondent-appellant.

Stanley C. Van Ness, Public Defender, Trenton, N.J., Anthony M. Mahoney, Designated Counsel, Bernstein & Mahoney, Cranford, N.J., for petitioner-respondent.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Protesting that the prosecutor's remarks in summation were improper and that a purported apology merely added insult to constitutional injury, the petitioner convinced the district court to grant a writ of habeas corpus. After a review of the record, we conclude that the state courts which affirmed petitioner's conviction for attempted extortion properly applied appropriate constitutional standards. Accordingly, we vacate the order of the district court.

Petitioner Perry, a police officer in Newark, New Jersey, arrested one Willie Lee Jones for possession of narcotics, a charge for which he was eventually convicted in the state court. Officer Perry testified at both a suppression hearing and Jones' trial. After the verdict but before completion of the presentence report, Jones met with Perry. Both the purpose of the encounter and the responsibility for arranging it were sharply disputed. Jones contended that for $1,000 Perry offered to submit favorable comments to the presentence investigator. The officer's version was that Jones asked for his help in preparation of the report, and, sensing an opportunity to secure information on other narcotics offenders, Perry arranged for a subsequent meeting.

Jones reported the alleged bribe solicitation to the county prosecutor and agreed to attend the planned meeting at a neighborhood bar. In preparation for the rendezvous, the prosecutor supplied Jones with $300 in marked money, concealed a tape recorder on his person, and stationed detectives inside the bar. Shortly after the hour set, Perry entered the bar and began a conversation with Jones. The detectives observed Perry display his completed presentence report form to Jones. Only one of them was able to overhear any part of the conversation and that was limited to Jones saying, ". . . $300 . . .," and Perry replying, "ah ah." Perry and Jones then went to the men's room, but, before anything further transpired, a detective rushed in and arrested Perry. Jones still had all the marked money in his possession.

The body recorder failed to produce an audible tape, and Perry's trial for attempted extortion evolved essentially into a credibility contest between the police officer and the convicted drug dealer.

The first witness called by the prosecution was Richard J. Pavia, one of the investigators who participated in the surveillance at the neighborhood tavern. During the course of his direct testimony, he denied having any conversations with Perry after the arrest, and attempts by the prosecutor to have the witness refresh his recollection by reading the investigative report were thwarted by defense objections. Cross-examination began after a short recess and, in the course of answering defense counsel's questions, Pavia changed his original testimony by admitting that he spoke with the defendant after the arrest. The witness explained that he had talked to the prosecutor during the recess and realized he had misunderstood the questions on direct examination.

Neither party inquired at that time about the content of the conversation. However, at a later stage of the trial, the defense recalled Pavia, who, after admitting that he had summarized the defendant's conversation in the investigative report, read that portion to the jurors. It was a denial of any wrongdoing, and, in essence, an assertion by the defendant that he had been "set up" by Jones.

In his summation to the jury, defense counsel commented on this incident and said in part:

"[H]e [Pavia] said I never had any conversations with Officer Perry and then later, after we had a break, and I say this with all due respect to the Prosecutor, I'm not trying to make any accusation against him. Tony Mautone [the prosecutor] is a nice kid and is trying the case to the best of his ability. But, you will recall that we had a break and then Pavia went back on to the stand and then Pavia qualified his answer that he never had any conversations with Perry and said, 'Oh, I thought you meant at the bar,' but I didn't, but he said he did have a conversation with him in his office, period. Nothing further was said about what that conversation contained or what that conversation related to. Pavia left the stand. Mr. Mautone didn't try to bring out the conversation. I didn't know anything about the conversation. I didn't believe he had any conversation and that's why I rested there until later on in the case when I asked to see the report and there was some argument and 1 said, call Mr. Pavia back and let's hear from him forgetting about the report and Mr. Pavia was called back and then for the first time in this case, after Mr. Mautone said I have nothing to hide, then for the first time we learn that Mr. Pavia in his report had recorded a conversation that he had with Officer Perry and then for the first time we learned what that conversation between Pavia and Perry was and that it was almost identical with the testimony that Perry had given from that stand both on direct and on cross-examination. Something to consider, isn't it. And, while we are on the line of we have nothing to hide, I have nothing to hide, let me not forget and call your attention to this report, its' [sic] in evidence and you'll get it, and of course, you have read it and you'll have it to read again."

Defense counsel thus left a strong implication that witness Pavia had been "coached" by the prosecutor during the recess before cross-examination began.

In his summation, the prosecutor alluded to the defense comments and began a rather lengthy discussion of the incident by saying, "But Mr. Maurer in the course of his summation tells you that when Inspector Pavia came back he spit out the words that I told him to and that he and I corrected everything." The prosecutor admitted that he had spoken to the witness during the recess. He commented on the sequestration of the state's witnesses and said:

"But, remember one thing, remember the one man who sits here and listens to everything that everybody says, remember the one man who sits here and listens to everything that every single person, every single word said by every single state witness before he even had to open up his mouth, which he knew he had to do. But the one man who hears everything that every witness produced by the State says is this defendant, every defendant does, the defendant hears it all. The defendant sits right there at the counsel table as does his lawyer and make no mistake about it, I have no objection to Mr. Maurer counseling his witness, his defendant. That's his obligation to do so, and he is a good lawyer, and he has been around a long time. Make no mistake about it, he tells his man what to say and how to say it and in a certain context . . . ."

At this point defense counsel protested, and the court said, "Yes, I find that objectionable and I ask that it be stricken." The prosecutor then went on to say:

"Mr. Maurer as does his defendant has every opportunity to sit here and listen to all of the testimony. He not only has a right but he has the obligation to discuss testimony with his client as do I and as I do, I not only have the right to talk to the witnesses I'm going to produce but I have the obligation to talk to them before the [sic] testify. So when Mr. Maurer makes the implication that I tell Investigator Pavia what to say and to be honest with you, Mr. Maurer's objection is well taken, I did not mean to imply, although I worded it so it sounded that way, I didn't

mean to imply that Mr. Maurer puts words in his client's mouth or tells him to lie. I don't mean to imply that for a minute and I'm sure that Mr. Maurer got that impression as did the Court obviously from the objection and its being sustained. But, my point is that Mr. Maurer and his client sit here all the time and listen to everything and then he testifies. There is nothing wrong with his counseling him, but you must be aware of it and you can't blot it out of your mind. You must be aware that I have talked to my witnesses too."

At another point in his summation, the prosecutor stated:

"And, believe me there is much more on trial here than just Andrew Perry. Everytime you come back with a verdict, everytime that foreman gets us [sic] and addresses to the Court his verdict, whether it be guilty or not guilty, the system has been put to the test. The system of jurisprudence upon which we operate. The system of jurisprudence which affords to every defendant who will ever be seated at the counsel table before a judge in a criminal action is again put to the test. I submit to you that there is also another system on trial in this case, the system of law which governs every defendant on the street like Willie Lee Jones. The system of law which says to every defendant like Willie Lee Jones, if you commit a crime, you are going to be arrested and you are going to be prosecuted and you are going to be found guilty and you are going to be sentenced. The system of law which affords to Willie Lee Jones as it does to Andrew Perry the same rights and privileges, the same equal rights and privileges. Andrew Perry has no more rights under our system, has no more privileges because he is a police officer or was a police officer than does Willie Lee Jones. All of the Willie Lee Joneses of the world are on trial here

and not only Andrew Perry. All the Willie Lee Joneses. And you by your verdict will say whether or not the Willie Lee Joneses of the world are going to be given a fair shake, or whether or not the Willie Lee Joneses of this world are going to be subjected to not only being arrested for whatever crime they may have committed but whether or not they are going to be subjected to further arrest after that and whether or not because of the position which they find themselves in the Willie Lee Joneses of this world are going to have to pay through the nose to everybody. That has got to stop, ladies and gentlemen. It has got to stop."

Defense counsel did not object to this comment.

Finally, the prosecutor said:

"I am asking you now that after you listen to His Honor's charge come back with a verdict of guilty relative to Mr. Perry. I'm telling you to come back and tell Mr. Perry and every other dishonest cop, and there are some unfortunately, no we are sick and tired, we the public who really make up the laws, and that he in that capacity is charged with enforcing the laws, that we are sick and tired of the Willie Lee Joneses in this world being taken advantage of, the Willie Lee Joneses in this world who have enough of their problems, that they need our help and that we are sick and tired of making more problems for them."

Again, the defense did not object.

The jury returned a verdict of guilty, and, on appeal, both the Superior Court and the Supreme Court of New Jersey (with one justice dissenting) affirmed the conviction, holding that when "[a]ppraised against the background of the trial, the whole summation and the judge's charge, the passages complained of did not vitiate the fairness of the trial." [1]

The district court granted the writ of habeas corpus, concluding that, taken to-

---

1. *State v. Perry*, 65 N.J. 45, 319 A.2d 474, 475 (1974), aff'g, *State v. Perry*, 128 N.J.Super. 188, 319 A.2d 505 (1973). The district court's opin-

ion is published at 399 F.Supp. 1285 (D.N.J. 1975).

gether, the prosecutorial comments about "all the Willie Lee Joneses of the world" deprived petitioner of his constitutionally guaranteed right to a fair trial. The court further held that the reference to his lawyer impinged upon the defendant's Sixth Amendment right to counsel.

In cases of this nature, our review of the state court proceedings is narrow for "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). If it is contended that the prosecutor's remarks so prejudiced a specific right guaranteed by the Bill of Rights as to amount to a denial of that right, then the court takes special care to assure that no impermissible infringement has taken place. However, in other situations, the test is whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. at 643, 94 S.Ct. at 1868. It is essential to distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due process.

Thus, we must first determine whether petitioner's Sixth Amendment right to counsel was violated by the prosecutorial comment. If so, we must then decide if it was harmless beyond a reasonable doubt. Finally, we must determine whether the prosecutor's "Willie Lee Joneses" remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 643, 94 S.Ct. at 1871.

Improper influence on the testimony of a witness by counsel was an issue first injected into the case by the defendant, and it was in reaction to this implication of wrongdoing that the prosecutor made his unfortunate response. The district court

thought that the remarks of the prosecutor following the defense objection and the trial court's ruling, although ostensibly an apology, constituted an artful and successful maneuver to restate the objectionable comments.[2] However, we do not attribute such an intention to the prosecutor nor do we believe that the apology was received as anything other than that by the jury or trial judge.

In our view the challenged remarks are not such a reflection on the conduct of counsel as to amount to an attempt to penalize the defendant for exercising his right to retain a lawyer. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The prosecutor's statements were directed more to excuse his own alleged dereliction on the ground that the defendant's lawyer did the same thing, *i. e.*, there was nothing more improper in the prosecutor speaking to witness Pavia than was the action of defense counsel in consulting with his client. There is an obvious difference between the tenor of such a remark and that in *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), where it was implied that the act of retaining counsel was evidence of guilt.

In *United States v. Lawson*, 337 F.2d 800, 810 (3d Cir.), *cert. denied*, 380 U.S. 919, 85 S.Ct. 913, 13 L.Ed.2d 804 (1965), we were confronted with a remark somewhat akin to the one at issue. In that case, we said:

"The appellant also contends that the remark 'where do you think he got that?' was a 'reprehensible innuendo that the defendant's testimony was prompted by his lawyer.' The question was unclear and at best rhetorical. It had, however, no consequences prejudicial to appellant."

Moreover, in his summation, defense counsel intimated that the defendant's act in not retaining a lawyer immediately was proof of innocence. He said:

"The *Miranda* warnings, are very, very important. *Mr. Perry didn't say,* oh no, he is a police officer and he is thoroughly

2. *Perry v. Mulligan*, 399 F.Supp. at 1291.

familiar with it *I don't want to sign that, I want to see my lawyer.* Did he act like a man who had committed a crime and was trying to cover up. No . . . he is the man that had nothing to hide and that's why he signed the *Miranda* warning." (emphasis supplied)

We find it highly unlikely that the jury understood the prosecutor to be saying that a defendant who retained a lawyer could not be found to be credible. If such an implication indeed was present, we find it so attenuated and delitescent as to be imperceptible to the average layman. Belief that a jury would accept such a connotation is simply divorced from reality. Moreover, as the Court said in *Donnelly v. DeChristoforo,* 416 U.S. at 647, 94 S.Ct. at 1873:

> ". . . a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

We conclude that there was no impermissible infringement upon the defendant's right to counsel as guaranteed by the Bill of Rights. Even assuming, *arguendo,* and we emphasize *only arguendo,* that a Sixth Amendment violation occurred, we entertain no doubt that the error did not influence the jury's deliberation and it was therefore harmless beyond a reasonable doubt.

The trial judge's ruling sustaining the defense objection in the midst of the prosecutor's summation constituted a rebuke

from the bench which, to say the least, was not helpful to the county attorney. His apologetic remarks following thereafter were naturally intended to ameliorate the situation, not to exacerbate it. The cold record cannot convey to a reviewing court the atmosphere in the trial court at the time, and we must rely to a great extent on the expressions of court and counsel.[3] Since neither the court nor defense counsel made any further protest at that point, it is reasonable to assume that they thought the prosecutor was being contrite and not contriving. We believe that the apology was acceptable and, in combination with the court's ruling, cured whatever harm may have taken place.

Moreover, it is generally accepted that in determining whether prosecutorial arguments constitute reversible error, provocation is a factor which must be considered. *United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. La-Sorsa,* 480 F.2d 522 (2d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); *United States v. Benter,* 457 F.2d 1174 (2d Cir. 1972). The proposition has been subjected to some criticism but still retains vitality and is applicable here.[4] Although there may be some question whether a constitutional violation may be excused by provocation, that factor in our view is a consideration to be weighed in determining the impact of the challenged comments upon the jury.

Similarly, we hold that the prosecutor's extended comments that all the Willie Lee Joneses of the world should be given a "fair

---

**3.** Unquestionably, videotaping of the summation of counsel and the charge of the court would be of great assistance to reviewing courts when these portions of a trial are alleged to contain error. Facial expressions, gestures, vocal inflections, nuances in emphasis, etc., recorded by this modern technique would present a far better basis for judgment on whether challenged statements have substantial impact upon the trial process.

It is unfortunate that even now, when the technology is available, courts are not using video tape recordings to any substantial degree. Thus, instances of alleged prejudicial remarks of counsel, similar to those which oc-

curred here, or of improper statements during the charge of the jury as in *United States ex rel. Harding v. Marks,* 541 F.2d 402 (3d Cir., 1976), which occur in a courtroom today must be decided in the future only by reference to an expressionless printed transcript.

**4.** *See* Singer, Forensic Misconduct by Federal Prosecutors and How It Grew, 20 Ala.L.Rev. 227, 247 (1968); The Nature and Consequences of Forensic Misconduct in the Prosecution of a Criminal Case, 54 Colum.L.Rev. 946, 972 (1954); Vess, Walking a Tight Rope: A Survey of Limitations on the Prosecutor's Closing Argument, 64 J. of Crim.Law 22, 52 (1973).

shake" did not infect the trial with unfairness so as to make the resulting conviction a denial of due process.

In his summation defense counsel dismissed Willie Lee Jones' testimony as that of a "convicted narcotics dealer . . . he stood trial before a judge and jury and they didn't believe a word he said and found him guilty . . . .. Nobody believed this man and I say, ladies and gentlemen, no not even the men in the prosecutor's office believed this man." It is understandable that the prosecutor tried to minimize this attack by seeking to enlist the jury's sense of justice in believing that Jones had been punished beyond that which the law requires. In this day and age, however, we are unable to accept the contention that the jury was so influenced by any feeling of compassion for the convicted narcotics dealer as to have based its verdict upon that factor rather than on the evidence.

■ The essence of an improper appeal to the jurors is that it is directed to passion or prejudice rather than to an understanding of the facts and of the law. Thus, repeated racial slurs, *United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir. 1973); raising the spectre of martial law in a time of racial violence, *Brown v. United States,* 125 U.S.App.D.C. 220, 370 F.2d 242 (1966); and an appeal to patriotism in time of war, *Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), have been held to be remarks too likely to influence the jury in its deliberations. However, in *Tenorio v. United States,* 390 F.2d 96, 99 (9th Cir.), *cert. denied,* 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968), the court noted:

"Counsel are entitled to a reasonable degree of latitude in the presentation of argument, and the prosecutor's comment concerning 'the destruction and the human waste which arises from the use of heroin' contained nothing more than that

which is within the common knowledge of all reasonable people."

■ In our opinion, the remarks of the prosecutor in the case at bar did not have the effect of arousing the prejudice of the jury, particularly since the harm which is caused by police corruption is a matter of common knowledge. As Judge Goodrich said in *United States v. Kravitz,* 281 F.2d 581, 586 (3d Cir. 1960):

"We think little of the words used by the prosecutor. We think they were unnecessary in an otherwise logical and convincing summation. But we quite realize as we have said before that some latitude must be given to lawyers' language in a hard fought case. To say that this remark would have a prejudicial effect on a jury which had listened throughout a long trial to the unfolding of the testimony is to attribute a stupidity and absence of common sense which is incredible in a federal jury."

We note also that defense counsel made no objection to these remarks nor did he request any corrective instruction from the trial court. In *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the Supreme Court again emphasized the necessity of entering an objection upon the record so that the trial judge would have an opportunity to remedy the error.[5] The absence of protest also may be a gauge of the courtroom atmosphere. It may be assumed that the prosecutor's oratory, although extended, fell short of being electrifying and defense counsel saw no need to do anything other than ignore it.

We have reviewed the trial transcript in this case and agree with the evaluation of the Supreme Court of New Jersey that "the alleged error must be regarded as inconsequential and clearly incapable of producing an unjust result."

Having found no error which would constitute a lack of due process or a denial of

---

5. In *United States v. LeFevre,* 483 F.2d 477 (3d Cir. 1973), we stated that it is the duty of the trial judge to correct prosecutorial conduct without reliance upon the defense's objections. That case, however, was tried in one of the district courts of this circuit and the admonition is a proper exercise of our supervisory power. The case at bar, of course, was tried in the state court and, as we noted earlier, our standard of review is different.

the right to counsel, we will vacate the order of the district court.