Karen Anne **FENNELL** a/k/a Ann Fennell, Petitioner,

v.

Ann **GOOLSBY,** Warden, State Correctional Institution, Muncy, Pennsylvania and the Attorney General of the State of Pennsylvania, District Attorney of Montgomery County, Respondents.

Civ. A. No. 84–1351.

United States District Court, E.D. Pennsylvania.

Aug. 28, 1985.

452

Karen Anne Fennell, pro se.

Charles J. Weiss, Timoney, Knox, Hasson & Weand, Ambler, Pa., for petitioner.

Joseph J. Hylan, Dist. Atty. of Montgomery County, Norristown, Pa., for respondents.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

This petition for writ of *habeas corpus* challenges the constitutionality of petitioner's confinement after conviction in state

court for voluntary manslaughter, recklessly endangering another person and simple assault. This court has jurisdiction under 28 U.S.C. § 2254(a).

On February 23, 1979, at 10:45 p.m., petitioner, a 46-year old woman, drove her car into a service station in Norristown, Pennsylvania where the automobile of her husband, Michael Fennell, was parked. Petitioner drove forward at a high rate of speed and struck her husband's automobile on the left side while he was in the driver's seat. She then backed up, came forward, and struck his car again. Her husband escaped from the car and attempted to run to the service station. Before he was able to reach the office, she struck him with her car several times. Michael Fennell was pronounced dead on arrival at a local hospital.

On February 24, 1979, petitioner was charged with murder, voluntary manslaughter, involuntary manslaughter, aggravated assault and recklessly endangering another person. Following a jury trial in the Common Pleas Court in Montgomery County, she was convicted of voluntary manslaughter on August 31, 1979. On April 23, 1980, she was sentenced to 3½ to ten years' imprisonment. Petitioner appealed the final judgment to the Pennsylvania Supreme Court; judgment of sentence was affirmed without opinion on December 29, 1982. On May 18, 1983, the Pennsylvania Supreme Court denied petitioner's request for reconsideration and/or reargument.

Petitioner then filed a petition for *habeas corpus* with this court on the ground that the state court proceedings deprived her of her Sixth Amendment right to present witnesses in her defense and her Fourteenth Amendment right to due process of law. These challenges are based on two contentions: 1) petitioner was denied the right to present evidence in her defense in violation of the Sixth Amendment by the trial court's refusal to allow her to present an expert witness to testify on the effect of spousal abuse on her state of mind and to explain "battered woman syndrome"; 2)

the trial judge did not charge the jury that intent was a necessary element of the offense of voluntary manslaughter nor did he instruct the jury that the prosecution was required to prove intent beyond a reasonable doubt, in violation of the Fourteenth Amendment.

■ Under 28 U.S.C. § 2254(b), a state prisoner is required to exhaust state remedies before presenting a claim for *habeas corpus* to a federal court. The exhaustion doctrine is an essential element of federal-state comity, "an accommodation of our federal system designed to give the State the initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971). In order to meet the exhaustion requirement, a petitioner must have presented all constitutional claims to the state courts at least once, on direct or collateral review. Where a petitioner raises more than one constitutional challenge, the district court must dismiss the petition unless all of the asserted claims have been exhausted. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

In determining what constitutes a fair presentation, the Supreme Court has required that the claim presented to the state court be the "substantial equivalent" of the claim asserted in a federal *habeas corpus* petition. *See Picard v. Connor*, 404 U.S. 270, 278, 92 S.Ct. 509, 513–14, 30 L.Ed.2d 438 (1971). Such a determination requires "a searching scrutiny by the federal habeas court of the points that were raised in the state tribunals, in order to ensure that the state system was granted a fair opportunity to confront arguments that are propounded to the federal habeas courts." *Zicarelli v. Gray*, 543 F.2d 466, 472 (3d Cir. 1976) (*en banc*). Later decisions of the Supreme Court have clarified the scope of the word "claim" for purposes of exhaustion. The Court has held that the "method of analysis" asserted in the federal court must have been "readily available to the state court." *Stanley v. Illinois*, 405 U.S. 645, 658 n. 10, 92 S.Ct. 1208, 1216 n. 10, 31

L.Ed.2d 551 (1972). Within the contours of a particular argument, however, a petitioner is not required to present every facet of the argument to the state court in order to exhaust remedies. *Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249–50, 39 L.Ed.2d 605 (1974).

In the present case, petitioner satisfactorily exhausted her remedies as to both claims. Her argument that the failure to allow spousal abuse testimony violated her Sixth Amendment right to present "relevant and important defensive evidence" was presented in post-trial motions and in her brief on appeal to the Supreme Court of Pennsylvania.

Petitioner's contention that her due process rights were violated by the trial court's failure to instruct the jury on the element of intent necessary for a conviction of voluntary manslaughter was also raised both in the trial court and in the Supreme Court of Pennsylvania, although in a cursory fashion.

■ Petitioner's post-trial brief states: "If an unlawful state of mind or *mens rea* is not required for voluntary manslaughter, then 18 Pa.C.S.A. § 2503 violates due process." (Petitioner's Post-Trial Brief, p. 27). Although the petitioner did not elaborate as to how her due process rights were violated by the allegedly faulty charge, the statement raised the identical issue presented here and was sufficient to put the court on notice of the constitutional claim. As long as an issue is generally presented to a state court, specific arguments in support of the claim need not be averred. *United States ex rel. Johnson v. Johnson*, 531 F.2d 169 (3d Cir.1976).

■ In a federal *habeas corpus* case, the review of state court proceedings is very narrow in scope. It is not the function of a federal court to determine whether, in reaching its conclusions, the Supreme Court of Pennsylvania may have erred. *See United States ex rel. Almeida v. Rundle*, 383 F.2d 421, 427 (3d Cir.1967). Rather, the court must decide whether the error was of sufficient magnitude to deny petitioner rights guaranteed by the Constitution. "Not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

■ Petitioner first contends that the trial court erred in excluding the testimony of Elaine Sanders, a supervisor at the Marital Abuse Project of Delaware County, as a defense expert on the subject of battered women and that the refusal to admit this evidence denied petitioner's Sixth Amendment right to present a witness in her defense. An initial offer of proof on this issue was made on August 21, 1979. According to petitioner's counsel, the evidence was offered to establish the dynamics of an abusive relationship and to explain how prolonged abuse can affect behavior, perceptions, and mental state. Although Ms. Sanders had never personally treated petitioner, a counsellor supervised by her had interviewed Ms. Fennell and prepared several reports.

Following the initial offer of proof, the trial court stated that Ms. Sanders would not be permitted to testify unless and until the defense put in direct evidence of abuse suffered by petitioner at the hands of her husband. After such evidence was presented, petitioner made another offer of proof regarding the proposed testimony of Ms. Sanders. The trial court refused to admit the expert testimony without stating any reasons for its refusal at the time of trial. However, it appears from the context of the questions asked of defense counsel by the trial judge that Ms. Sanders was not permitted to testify because she did not personally interview or treat petitioner. The trial court in its Opinion of March 4, 1981 denying petitioner's post-trial motions, stated:

Defendant had no contact with the [Marital Abuse] Project prior to the killing .... The witness was not to respond to a hypothetical question based on evidence

of record but rather to testify generally about spousal abuse and then relate it to reports prepared by a third party. The witness had no personal knowledge of defendant's condition either before or after the killing. It was apparently a device to get in evidence extrajudicial self-serving statements by the defendant. (Trial Court's Opinion of March 4, 1981 at p. 26).

Prior to determining whether the exclusion of this testimony was error of constitutional magnitude, we must consider whether Ms. Sanders' testimony was admissible so that its exclusion was erroneous. Then we must determine whether the trial court's refusal to admit the testimony of Elaine Sanders constituted a denial of petitioner's Sixth Amendment right to present witnesses in her defense and, if so, whether the refusal was harmless beyond a reasonable doubt. *See United States ex rel. Perry v. Mulligan,* 544 F.2d 674 (3d Cir.1976).

The "battered woman syndrome" generally refers to common characteristics appearing in women who are physically and psychologically abused by their mates.[1] The typical pattern of violence consists of three recurrent phases of abuse: a tension-building stage, characterized by minor abuse; an acute battering stage, characterized by uncontrollable explosions of brutal violence; and a loving respite stage, characterized by calm and loving behavior of the batterer, coupled with pleas for forgiveness.[2] The continued cycle of violence and contrition results in the battered woman living in a state of learned helplessness. Because she is financially dependent on the batterer, she may feel partly responsible for the batterer's violence, she may believe that her children need a father, or fear reprisal if she leaves. The battered woman lives with constant fear, coupled with a perceived inability to escape. Eventually she comes to believe that her only options are enduring the abuse, striking back, or committing suicide.

The trial court's rejection of Ms. Sanders' testimony was based on Ms. Sanders' lack of personal knowledge of petitioner's condition either before or after the killing; her conclusions concerning petitioner were based on her study of reports prepared by a third party. Excluding the evidence for this reason was erroneous; an expert need have no personal knowledge of the facts in order to provide an expert opinion. *See McCormick on Evidence* § 14 (2d Ed. E. Cleary 1972). Under Pennsylvania law, "record evidence upon which the expert relies may be based upon personal examinations, the assumed truth of the testimony of other witnesses, or upon a combination of these sources." *Ranieli v. Mutual Life Insurance Company of America,* 271 Pa.Super. 261, 413 A.2d 396, 398 (1979). An expert who does not have personal knowledge of the facts may testify as long as the facts upon which the expert relies are in the record. *See Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968).

▇ In this case, there was a large amount of evidence of record of a history of abuse by Michael Fennell upon which Ms. Sanders could base her conclusions. There was evidence that Michael Fennell was an alcoholic and that during his drunken states, he would subject his wife to physical and mental abuse. Michael Fennell, Jr. testified that his father would pin petitioner against the wall, grab her and hold her. (Tr. 8/24/79 p. 7C). He also stated that he saw his father hit his mother so hard that it knocked her down. (Tr. 8/24/79 p. 9C). On another occasion he saw his father pick up a knife and threaten his mother with it. (Tr. 8/24/79 p. 10C). He testified that even after Ms. Fennell

---

**1.** Dr. Lenore Walker, the research pioneer in the field, describes the battered woman as one "who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without concern for her rights." *See* L. Walker, *The Battered Woman,* at XV (1979).

**2.** *See* Comment, *The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis,* 77 N.W.L.Rev. 348, 350 (1982).

had her husband removed from the home by court order under the Pennsylvania Protection from Abuse Act, he would continually harass the family by an endless series of telephone calls.

Susanne Fennell DeGroat, stated that her father often harassed her mother at night and prevented her from sleeping. (Tr. 8/24/79 p. 153C). On several occasions, Mrs. Fennell came into her daughter's room to sleep and Michael Fennell came in with no clothes on to pull her out of her daughter's bed. (Tr. 8/24/79 p. 161C). She stated that sometimes when her mother was sleeping on the couch, her father would get on top of her against her will. (Tr. 8/24/79 p. 158C). She also testified to continued telephone harassment by her father following his eviction from their home. (Tr. 8/24/79 p. 25D).

But most of the evidence concerning abuse came from petitioner herself. During the last three to four years of the marriage, Ms. Fennell testified that the abuse, both physical and mental, was almost constant. (Tr. 8/27/79 p. 109D). Petitioner's husband had a severe drinking problem and Ms. Fennell placed him in an Alcohol Rehabilitation Center twice; Ms. Fennell testified that when her husband was drinking, his behavior would become extremely violent and abusive. He threatened her verbally, pushed, kicked, punched, and tried to choke her. (Tr. 8/27/79 p. 115–117D). On one occasion, he burned her neck with a cigarette. (Tr. 8/27/79 p. 147D). She claimed that her husband often forced sexual relations upon her when he was drinking. (Tr. 8/27/79 p. 129D). She testified that he forced her to have sex with him while she was in the hospital recovering from surgery. (Tr. 8/27/79 p. 164D). She also stated that her husband did not allow her to sleep and that she often left their bedroom to sleep in her daughter's room, on the living room couch or in the bathtub. (Tr. 8/27/79 p. 121D). She claimed that he frequently would not let her leave the house. (Tr. 8/27/79 p. 158–159D).

This pattern of continual physical and emotional abuse and her husband's severe drinking problem, led petitioner to have her husband removed from their home by court order under the Pennsylvania Protection from Abuse Act. Even after his eviction in August, 1978, her husband would call several hundred times a day; to prevent the phone from ringing, she took the phone off the hook. (Tr. 8/28/79 p. 15E). During this period of eviction, her husband came to the house and threatened her. The testimony from the Fennell children and petitioner, if believed by the jury, was sufficient to establish that petitioner was a battered woman.

Because Ms. Sanders would have testified based on this evidence presented of record, the court's stated reason for excluding her testimony was erroneous.

If the whole of the testimony delivered by one of the parties, or by certain of the witnesses for one party, is made known to the expert, either by his reading it or hearing it, and he is then asked his opinion upon it, assuming it to be true, in either case the opinion is sought upon an assumed state of facts, and may therefore be given.

*Kelly v. Martino*, 375 Pa. 244, 99 A.2d 901, 902 (1953). The jury might accept or reject the foundation upon which Ms. Sanders based her testimony (*i.e.*, the alleged pattern of abuse inflicted upon Ms. Fennell by her husband). It could then decide whether to accept Ms. Sanders' statements that Ms. Fennell suffered from the battered woman syndrome based upon that foundation of facts. Hence, the fact that Ms. Sanders never personally examined or interviewed Ms. Fennell does not render her expert testimony inadmissible.

Although we find that the reason offered by the trial court for refusing the testimony was erroneous, we still must decide whether the proposed evidence satisfied the criteria for admission of expert testimony. Unless the evidence met all of the requirements of expert testimony, the trial court's failure to admit it was not error.

Evidence of the battered woman syndrome, like other expert testimony, must satisfy three requirements to be admissible: 1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; 2) the expert witness must have sufficient skill, knowledge, or experience in that field or calling to make it appear that his or her opinion or inference will probably aid the trier of fact in his or her search for the truth; 3) the state of the pertinent art or scientific knowledge must permit a reasonable opinion to be asserted by the expert. *McCormick on Evidence* § 13 (2d Ed. E. Cleary 1972).

The scope of review on this issue is narrow, for the "trial judge has broad discretion regarding admission or exclusion of expert evidence, and is sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). In exercising discretion, the trial court must be guided by the principle that the "defense should be free to introduce appropriate expert testimony." *Kaplan v. California*, 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973). However, because expert and scientific testimony possess an "aura of special reliability and trustworthiness," the proffer of such evidence is carefully scrutinized. *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973).

In *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C.Ct.App.1979), the court found that the psychological effects of repeated spousal abuse are beyond the understanding of the average layperson and that the testimony should be admissible for the purposes of informing the jury that there is an identifiable class of persons characterized as "battered women," and explaining why the mentality and behavior of such women are at variance with the ordinary lay perception of how an abused spouse would be likely to react. 407 A.2d at 634. It is clear that expert testimony on battered woman syndrome is distinctly related to psychological evaluations beyond the comprehension of the average layperson, and will assist the trier of fact to understand the evidence. *See also Smith v. State* 247 Ga. 612, 277 S.E.2d 678 (1981); *State v. Anaya*, 438 A.2d 892 (Sup.Jud.Ct. Me.1981).

An additional requirement is that the expert witness must have a reasonable pretension to specialized knowledge on the subject under investigation. *Kusis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974). The function of the sufficiency requirement is to set a minimum standard of expertise. The witness proffered by the defense, Elaine Sanders, had sufficient expertise to qualify as an expert. In his offer of proof, counsel for petitioner stated that Ms. Sanders was a supervisor at the Marital Abuse Project of Delaware County, Pennsylvania, an organization which had assisted over 2,500 individuals. Counsel for petitioner stated that Ms. Sanders was a specialist in marital abuse with substantial education, training and experience in the field. Although it is not clear from the offer of proof if Ms. Sanders had formal training in clinical psychology or psychiatry, her vast experience in marital abuse qualifies her as an expert who would shed light on the usual behavior of battered women. Doubts concerning the witness' qualifications could have been addressed by opposing counsel in cross-examination prior to the remainder of her testimony. *See Rutter v. Northeastern Beaver County School Dist.*, 496 Pa. 590, 437 A.2d 1198 (1981).

The third criterion for admitting expert testimony, that the state of the pertinent art or specific knowledge permits a reasonable opinion to be asserted is also satisfied. This criterion focuses on the validity of the technique or methodology used by the expert in arriving at the opinion, not on the concept derived from that methodology. *Ibn-Tamas*, 407 A.2d at 638. To determine whether or not the subject is generally accepted as appropriate for expert testimony, the courts usually examine "[t]he number of published articles on the subject, the number of cases that have

allowed testimony based upon the theory, whether others in the field have duplicated the results of the research and testimony by others in the field on whether the theory has gained general acceptance." [3]

. The "battered woman syndrome" has received considerable attention and study in the mental health field. Moreover, conclusions drawn from studies of battered women are usually the product of clinical psychology research techniques. Despite its lack of exactitude, clinical psychology has become a recognized and accepted field of study capable of supporting expert opinion. *See, e.g., Commonwealth v. McCusker,* 448 Pa. 382, 387, 292 A.2d 286 (1972). The general acceptance of expert testimony on the battered woman syndrome has been acknowledged by legal authorities as well as the scientific community. Although no Pennsylvania cases have ruled on the admissibility of expert testimony on the battered woman syndrome, courts in other jurisdictions confronted with this question of the admissibility have accepted such testimony. *See, e.g., State v. Anaya,* 438 A.2d 892 (Sup.Jud.Ct.Me.1981), *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (1981); *State v. Baker,* 120 N.H. 773, 775–76, 424 A.2d 171, 172–73 (1980). Most of the reported opinions evidence a general acceptance of the methodology used by the expert sufficient to admit the testimony. This court follows those jurisdictions that hold there is sufficient evidence about battered woman syndrome to justify allowing expert witnesses to testify on the subject. Thus, the court finds that testimony concerning battered woman syndrome satisfies all three requirements for admissibility of expert testimony.

However, even if the proposed testimony satisfied the criteria for the admission of expert testimony, the trial court was also required to consider whether the evidence was relevant, that is, whether the evidence offered rendered an inference desired by the offering party more probable than it would be without the evidence and, if so, whether the probative force of such testimony outweighed any potential prejudice.

In his offer of proof, counsel for petitioner made the following statement concerning the purposes of Ms. Sander's testimony:

> She will testify as to the underlying causes and reasons for abuse general characteristics of an abuser and the abusee, so to speak, that is, the person who either willingly or unwillingly accepts the abuse. She will testify as to why someone in an abused situation will remain and accept the abuse.

(Tr. 8/27/79 p. 3D). Counsel also stated that after testifying generally concerning the effects on those who suffer from the battered woman syndrome, Ms. Sanders would relate her findings specifically to the case of Ms. Fennell.

In making a determination of relevancy, the court must first decide whether the evidence in the particular case supports a contention that the petitioner was a battered woman. Expert testimony on battered woman syndrome is irrelevant unless there is a sufficient factual basis for the fact that petitioner was a battered woman. Testimony by petitioner and by two of her children provided an evidentiary basis for the claims that decedent repeatedly abused petitioner physically and emotionally for a period of at least the last three or four years of their marriage.

Petitioner's offer of proof suggested that Ms. Sanders intended to testify that petitioner suffered from battered woman syndrome. The evidence of a pattern of abuse testified to by petitioner and her children laid a sufficient foundation for the admission of such testimony. Although the evidence here showed deviations from standard battered woman behavior,[4] such devia-

---

3. *See* Comment, *The Expert as Educator: A Proposed Approach to the Use of Battered Woman Syndrome Expert Testimony,* 35 Vand.L.Rev. 741, 745 (1982).

4. In the classic battered woman situation, the woman is unable to leave her mate and continues to endure the abuse. Here, petitioner had her husband ejected from their home by court order. Moreover, the killing in this case took

tions could have been addressed by the prosecution in cross-examination of the expert. The testimony by Ms. Sanders would have, at a minimum, corroborated petitioner's testimony and supported her credibility concerning the nature of her relationship with her husband and would have helped to explain why she remained with her husband for so many years.

■ In post-trial motions and briefs to the Supreme Court of Pennsylvania, petitioner also argued that the evidence would have been offered not just to buttress her credibility, but to explain how continued abuse could affect behavior, perceptions and mental state. Petitioner argued that Ms. Sanders' testimony would have supported petitioner's claims of insanity and self-defense. However, petitioner did not make such an offer at trial. Thus, although petitioner adequately established the relevance of the proposed testimony for the limited purpose of supporting her credibility, she did not lay a foundation for showing the evidence relevant to her self-defense and insanity claims at trial.

■ To prevail on this petition for *habeas corpus* it is not sufficient for the petitioner to show that the trial court committed reversible error in failing to admit her proposed testimony on battered woman syndrome. Unless petitioner here can show that the failure to admit this testimony deprived her of her due process rights, this court cannot grant her petition for *habeas corpus.*

■ The Sixth Amendment right of an accused to offer the testimony of witnesses and to compel their attendance, if necessary, has been found so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment. *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, this right to present witnesses in one's defense is *not* absolute but applies only when the proposed evidence is critical to a fair trial.

The cases cited by petitioner involved failure to admit the testimony of key fact witnesses to a crime. For example, in *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the defendant attempted to admit the testimony of an accomplice to a murder, who would testify that he rather than defendant, shot the victim. The Supreme Court held that the petitioner "was denied his right to have compulsory process for obtaining witnesses in his favor because the state arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying *to the events he had personally observed,* and whose testimony would have been relevant and material to the defense." 388 U.S. at 23, 87 S.Ct. at 1925 (emphasis added). The Supreme Court held that the compulsory process clause is violated by "arbitrary rules that .prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief." 388 U.S. at 22, 87 S.Ct. at 1925. In *Pettyjohn v. Hall,* 599 F.2d 476 (1st Cir.1979), the court held that the failure to allow the testimony of an eyewitness to a crime, to identify someone other than the defendant as the perpetrator, violated defendant's due process rights.

In contrast, petitioner here desired to introduce the testimony not of a fact witness to the crime, but of an expert on petitioner's mental state. Courts are generally granted far more discretion in determining the admissibility of expert testimony than of fact testimony. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). The proposed witness had no personal knowledge of defendant's condition either before or after the killing but was prepared to testify based on reports prepared by a third party and on facts of record. Ms. Sanders' testimony is not inadmissible because she did not personally observe petitioner's condition; however, the lack of personal observation does mitigate the error of excluding

place over six months after the couple had sepa-

rated, not while they were still living together.

such testimony especially when the proposed expert was not the only witness presented by defendant on the issue of her mental state. Two psychiatrists who had examined petitioner testified at length concerning her mental capacity. Therefore, Ms. Sanders' testimony was somewhat cumulative and cannot be considered vital to petitioner's defense.

Where the proposed evidence is not critical factual testimony but expert testimony offered for only the very limited purpose of supporting credibility, the trial court's failure to admit such testimony did not deny defendant her Sixth Amendment right to present witnesses in her defense. "The Sixth Amendment does not operate to prevent a state from adopting any limitations on defense evidence in criminal trials, but only prevents the adoption of broad arbitrary limitations." *Myers v. Frye*, 401 F.2d 18, 21 (7th Cir.1968).

 If the failure to admit this testimony were constitutional error, it was harmless beyond a reasonable doubt. "There may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here, there was significant testimony concerning petitioner's mental state from two psychiatrists who had examined petitioner shortly after the incident. Therefore, any testimony from Ms. Sanders concerning petitioner's mental state as an abused spouse would have been largely cumulative. The facts concerning the history of petitioner's abuse by her husband were brought before the jury; it could have drawn inferences concerning the effect of the continued abuse on Ms. Fennell's behavior. Thus, the jury was not denied testimony of essential facts but an expert's explanation of those facts. Viewing the evidence as a whole, the court concludes that the exclusion of this testimony was harmless error.

 As a second ground for granting her petition for *habeas corpus*, petitioner claims that the instructions given by the trial judge to the jury were constitutionally flawed because they failed to state that a conviction for voluntary manslaughter under 18 Pa.C.S.A. § 2503(a) requires an intent to kill and that the trial court's failure to charge that voluntary manslaughter requires an intent to kill violated her due process rights. She claims that if the jury is not instructed on all the elements of a crime, the prosecution has been relieved of its burden of satisfying the jury that all elements of the crime have been established beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Moreover, she argues that the failure to specify any *mens rea* for the crime of voluntary manslaughter converts the offense into a strict liability crime in violation of due process.

Title 18 Pa.C.S.A. § 2503 provides in part:

**(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

Intent is a required element for conviction under 18 Pa.C.S.A. § 2503(a). *See Commonwealth v. Pitts*, 486 Pa. 212, 404 A.2d 1305 (1979); *Commonwealth v. Mason*, 474 Pa. 308, 378 A.2d 807 (1977). In describing the elements of voluntary manslaughter under 18 Pa.C.S.A. § 2503(a) the

trial judge did not specifically state that an intent to kill is required.[5] This court must determine not only that the trial court's instruction resulted in prejudicial error, but "that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1977). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

In evaluating a challenge to the correctness of the instructions to the jury, the charge must be read and considered in its entirety and it is the general effect of the charge that controls. *Commonwealth v. Lesher*, 473 Pa. 141, 148, 373 A.2d 1088, 1091 (1977). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *See Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1977).

Viewing the jury charge as a whole, the court finds that the instruction concerning voluntary manslaughter, although somewhat confusing, was not erroneous. In *Commonwealth v. Siebert*, 274 Pa.Super. 184, 418 A.2d 357 (1980), the defendant also contended that the trial court erred in failing to instruct the jury that a specific intent to kill is an element of manslaughter. There the court stated: "The court defined 'murder' in terms of the requisite specific intent and distinguished voluntary manslaughter solely on the basis of the existence of provocation and passion. The element of intent was never eliminated or presented to the jury as a point distinguishing murder from manslaughter." *Id.* at 360.

Similarly, the trial judge here stated that intent was an element of the crime of murder first degree and did not exclude intent from the definition of voluntary manslaughter. The court distinguished voluntary manslaughter from murder in the following manner: "It is this sudden and intense passion provoked by the victim which negates the malice required in murder and reduces the crime to voluntary manslaughter." (Tr. 8/31/79 p. 67H). Therefore, the court's instructions, while not a model of clarity, did not specifically exclude the element of intent. Because we conclude that the trial court's charge on voluntary manslaughter was in accordance with Pennsylvania law, we cannot find constitutional error violative of due process standards requiring proof beyond a reasonable doubt of every element of the offense.

For the foregoing reasons, the petition for writ of *habeas corpus* is denied.

---

5. When charging the jury the trial court stated:
  The defendant is also charged with voluntary manslaughter. And the Code defines that crime in two ways:
  First, it is a killing without justification committed at a time when the defendant is acting under a sudden and intense passion resulting from serious provocation by the individual killed. Passion for this purpose includes anger, terror, rage or resentment. Serious provocation for this purpose is conduct sufficient to excite an intense passion in a reasonable person. It is this sudden and intense passion provoked by the victim which negates the malice required in murder and reduces the crime to voluntary manslaughter. You will recall that when I defined malice in connection with first and third degree murder, I spoke of it as a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty indicating an unjustified disregard for the value of human life. Malice has a quality of coldbloodedness which is lacking in voluntary manslaughter because in that crime it is replaced by the sudden and intense passion which I mentioned earlier. But this passion will not reduce murder to manslaughter if a reasonable cooling time elapses between the provocation and the killing.
  So if you find that the Commonwealth has proven beyond a reasonable doubt that the defendant did not act under a sudden and intense passion resulting from serious provocation by her husband, the crime of murder is not reduced to voluntary manslaughter.
  Tr. 8/31/79 pp. 67H–68H.