**Andrea TOURLAKIS, Petitioner,**

v.

**H.L. MORRIS, Respondent.**

**Nos. C–2–89–314, C–2–89–955.**

United States District Court, S.D. Ohio, E.D.

May 30, 1990.

John A. Bay, Ohio Public Defender Com'n, Columbus, Ohio, for petitioner.

Suzanne E. Mohr, Asst. Atty. Gen., Columbus, Ohio, for respondent.

## OPINION AND ORDER

GRAHAM, District Judge.

Petitioner, a state prisoner, brings this action for a writ of habeas corpus under the provisions of 28 U.S.C. § 2254. This matter is before the Court on the petition, respondent's return of writ, the trial transcripts in *State of Ohio v. Tourlakis,* No. CR–2–01520 (Cuyahoga Cty. Com.Pl.), petitioner's traverse [1] and the briefs and exhib-

---

1. Petitioner filed her initial habeas petition *pro se* on April 11, 1989 in Case No. 89–314. Petitioner, through counsel, filed a second habeas petition on November 17, 1989 in Case No. 89–955, raising the same claim presented in her initial *pro se* petition. Respondent's unopposed motion to consolidate was granted on December 27, 1989. Petitioner, through counsel, filed a traverse on January 11, 1990. By Order of this Court dated March 13, 1990, this Court directed

its of the parties. The issue presented in this case is whether petitioner's constitutional rights were violated as a result of the trial court's refusal to admit expert testimony on the battered woman syndrome.

## I. FACTS

The May, 1985 term of the Cuyahoga County, Ohio Grand Jury indicted petitioner on one count of attempted murder and two counts of felonious assault, with all three counts containing a gun specification. Petitioner initially entered a plea of not guilty but later withdrew her not guilty plea and entered a plea of not guilty by reason of insanity. After a psychiatric examination, petitioner withdrew her plea of not guilty by reason of insanity and reinstated her not guilty plea.

Prior to trial, the state made a motion *in limine* seeking to exclude any expert testimony on the "battered woman syndrome." The trial court granted the motion. Petitioner then waived her right to a trial to a jury and proceeded to trial before the judge. Petitioner asserted the defense of self-defense at trial, attempting to establish the victim's reputation and propensity for violence, including specific prior violent acts against petitioner, over prosecutor Ester Harbor's numerous objections. The trial judge found petitioner guilty of the count of attempted murder with the gun specification, but not guilty of the two counts of felonious assault. The trial court sentenced petitioner on April 10, 1986 to a term of five to twenty-five years imprisonment for attempted murder and a consecutive term of three years actual incarceration for the gun specification.

Petitioner appealed the judgment of the trial court to the Court of Appeals for the First Appellate District of Ohio, raising the following assignments of error:

1. The trial judge erred by excluding lay testimony on the victim's treatment of the defendant in the months preceding the incident in violation of defendant's right to a fair trial and due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article One, Sections Ten and Sixteen of the Ohio Constitution.

2. The trial court erred in excluding expert testimony on the defendant's state of mind at the time of the shooting.

3. The trial court erred by granting appellee's pretrial motion *in limine* to exclude all testimony on battered woman syndrome, expert testimony essential for the fact-finder to accurately determine defendant's state of mind.

4. The trial judge's repeated exclusion of lay and expert testimony on defendant's state of mind denied the defendant her right to a fair trial and due process of law as provided by article one section ten of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

5. The trial court's refusal to reduce the charge of attempted murder to voluntary manslaughter at the close of the state's case and at the close of the defendant's case was against the manifest weight of the evidence.

6. Ohio's concept of self-defense placing the burden of proof of this affirmative defense upon the defendant is in violation of Article One, Section Ten of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

The American Civil Liberties Union filed an *amicus* brief joining petitioner on her fourth assignment of error. In an opinion written by Judge Ann McManamon, the Court of Appeals overruled each assignment of error and affirmed the judgment

---

the parties to submit supplemental briefs addressing the possible impact of *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990) on this case. Respondent filed his supplemental brief

on April 16, 1990, and petitioner submitted her supplemental brief, through counsel, on April 26, 1990.

of the trial court. *State of Ohio v. Tourlakis,* No. 52035 (Cuyahoga Cty. App. Apr. 25, 1987). The Court of Appeals' decision accurately summarizes the evidence adduced at trial as follows:

> On the afternoon of July 20, 1985, the defendant, Andrea Tourlakis, shot and wounded her boyfriend, Murray Sparks. The state charged Tourlakis with attempted murder of Sparks and two counts of felonious assault against the paramedics who assisted Sparks. All three counts included firearm specifications. Tourlakis tried her case to the bench, arguing that she acted in self-defense in shooting Sparks. She further denied firing at the paramedics. The court acquitted Tourlakis of the felonious assault charges but found her guilty of attempted murder. In a timely appeal, she raises six assignments of error. [footnote omitted] Since none of her assignments are meritorious we affirm her conviction.
>
> The record discloses that Tourlakis and Sparks engaged in a sexual relationship for approximately one and one-half years before the shooting. They maintained separate residences, although Sparks picked the defendant up everynight [sic] after her shift at a local bar and typically stayed with her until the early morning hours. Both Tourlakis and Sparks described a deterioration in their relationship in the months before the shooting. According to Sparks, he stayed with Tourlakis until 12:30 A.M. on the day of the shooting. Although Sparks claimed he wished to break off with the defendant, he entertained a suspicion that she intended to go out after he left. Sparks returned to her residence shortly thereafter. Finding the house empty, Sparks threw a basket of clothes on the floor and knocked the phone off its receiver. Sparks testified that he repeatedly telephoned the defendant to determine when she returned home.
>
> Sparks further averred that Tourlakis telephoned him at 9:00 A.M. and 1:00 P.M. the following day, demanding that he return to her house. Sparks claimed that upon arriving there, she requested that he embrace her. According to Sparks, he spurned her advances, accused her of spending the night with another man and informed her that their relationship was over. However, Sparks told Tourlakis they could continue their joint efforts to purchase the bar where she worked if she so desired. Sparks testified that while he waited for her reply, Tourlakis secured a gun from her bedroom and shot him three times. The defendant continued to fire at Sparks as he ran into a nearby Convenience Store and finally into a parked Emergency Medical Service Ambulance.
>
> In response to questions about the nature of their relationship, Sparks averred that he had never threatened or beaten Tourlakis. He also testified that on July 12th, one week before he was wounded, the defendant fired a gun in his direction when he attempted to leave for the evening. He denied that any argument provoked that shooting.
>
> On her part, Tourlakis described a series of beatings and threats in the months before she wounded Sparks. Her testimony portrays Sparks as an intensely jealous and violent individual, always armed with a straight razor. For example, she testified that in March of 1985, while she was working, Sparks placed his razor on the bar and announced to her customers "you don't touch her." (Tr. 340). Tourlakis told the court that, in April of 1985, Sparks called her into the kitchen of the bar, put his hands around her throat and threatened to kill her. (Tr. 341). According to the defendant, Sparks also threatened her at home later that same month by holding his razor to her throat and telling her that "he was going to cut my body so no one else could look at me and he would break my legs." (Tr. 343).
>
> Tourlakis's version of the July 12th shooting differed from Sparks. [sic] She claimed that, following an argument, Sparks "... tore my whole body up ...", "... slammed me around, beat me up, my arms were totally bleeding." (Tr. 321–3). According to the defendant, she

shot at the wall and begged him to leave because she did not want to hurt him. She averred they argued every night the following week about her desire to end the relationship.

Tourlakis also testified to the events of July 19th and 20th which culminated in the wounding of Sparks. According to the defendant, she and Sparks argued about a man who had touched her shoulder at the bar. The defendant explained that after Sparks left her home, she went for a drive to get something to eat. Knowing Sparks would return, she called him the next morning to find out when to expect him. Tourlakis averred that when he arrived he stated that he loved her. According to Tourlakis, she shot Sparks as he stepped toward her. She testified that Sparks then threw a clothes basket at her and she wounded him two more times. She admitted chasing him from her home and firing as he entered the ambulance.

In a statement to the police, Tourlakis claimed that Sparks did not strike her that afternoon. She also acknowledged that she reloaded the gun as she chased him from her home. When questioned at trial about seeking help from others, she claimed she had nowhere to go.

The defense also presented the testimony of four patrons from the bar at which Tourlakis worked. Two of these witnesses testified to Spark's [sic] general reputation for violence and jealousy. Malcolm Leggon told the court that he witnessed Sparks hold a knife to Tourlakis in the spring of 1985. Carol Thompson averred that the defendant often wore turtlenecks to cover her bruises. The witness also was present in April of 1985 when Sparks allegedly told the defendant he was going to kill her. Clarence McAdams told the court that he broke up a fight at the bar when Sparks tried to choke Tourlakis.

.    .    .    .    .

In the instant case, Tourlakis proffered the testimony of Dr. Rosewater for our review. The record demonstrates that the psychologist was prepared to testify that the defendant's Minnesota Multiphasic Personality Inventory test scores were "... consistent with the diagnosis of post-traumatic stress syndrome, specifically the battered woman profile." (Tr. 457). She described Tourlakis's symptoms to include depression, confusion, and paranoia as well as an inability to escape or avoid violent situations. (Tr. 454). The proffered testimony further reveals that Dr. Rosewater opined that the syndrome from which Tourlakis suffered predated the shooting. (Tr. 462).

Petitioner next sought leave to appeal the Court of Appeals' decision to the Supreme Court of Ohio, asserting the following propositions of law:

1.  In a prosecution for attempted murder where the defendant pleads self-defense, the erroneous exclusion of substantial evidence of the alleged victim's prior acts of violence and threats of violence, and of the defendant's resulting state of mind, cannot be considered harmless, where the issue of the alleged victim's character for violence is sharply disputed.

2.  Testimony of the accused's clinical psychologist regarding the accused's mental state, based on the psychologist's testing and evaluation of the accused, and offered to support her claim of self defense in the shooting of her abusive boyfriend, is relevant and admissible to show the defendant's state of mind at the time of the killing; *State v. [Kathy] Thomas* distinguished.

3.  Expert testimony on the "battered woman syndrome," offered to support a claim of self defense, is relevant and admissible in evidence where (1) there is substantial evidence of a history of abuse and (2) the expert testimony is based on an evaluation of the defendant's particular psychological characteristics; *State v. Thomas* overruled.

The Supreme Court of Ohio *sua sponte* dismissed petitioner's appeal by an entry dated October 21, 1987, stating as its rea-

son that the appeal did not present a substantial constitutional question.

## II. CLAIM PRESENTED

Petitioner, in her *pro se* petition filed in Case No. 89–314, raises the following claim:

Conviction obtained by not allowing expert testimony denying defendant to [sic] a fair trial 5, 6, 14th Amendments, U.S. 1–10 and 16 of Ohio.

*Supporting Facts:* The Court ruled in favor of the prosecutor on a motion to disallow any expert testimony as [sic] the state of mind the defendant was in at the time of offense and prior to alleged offense, denying defendant a fair trial.

In the petition filed through counsel in Case No. 89–955, petitioner likewise asserts that her conviction was obtained by a violation of her right to a fair trial and due process of law as a result of the trial court's exclusion of expert testimony on the battered woman syndrome. The Court finds that petitioner has exhausted her available state court remedies with respect to the claim raised in the instant petition.

## III. DISCUSSION

### A. Commentary And State Law On Admissibility.

█ Respondent argues that the exclusion of the expert testimony was correct under Ohio law and that the exclusion did not deny petitioner a fundamentally fair trial. Indeed, evidentiary questions do not rise to the constitutional level unless the error was so prejudicial as to deprive the defendant of a fundamentally fair trial. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 396, 78 L.Ed.2d 338 (1983); *Burks v. Egeler,* 512 F.2d 221, 223 (6th Cir.), *cert. denied,* 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975).

█ There can be no question that the trial court's decision in the instant case was correct under Ohio law. The evidentiary rule in effect at the time of petitioner's trial was that expert testimony on the battered woman syndrome was inadmissible to support a defense of self-defense in murder cases. *State v. Thomas,* 66 Ohio St.2d 518, 423 N.E.2d 137 (1981) (syllabus by the court), *over'd, State v. Koss,* 49 Ohio St.3d 213, 551 N.E.2d 970 (1990).[2] Both the trial court and the Court of Appeals in petitioner's case relied upon *State v. Thomas* in reaching the conclusion that the proffered expert testimony on the battered woman syndrome was inadmissible. This Court "must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

Numerous commentators have written on the subject of the battered woman syndrome and whether expert testimony on the battered woman syndrome should be admissible to prove self-defense. *See e.g.* C. Gillespie, *Justifiable Homicide: Battered Women, Self-defense, And The Law* (1989) (discussing the battered woman syndrome from historical, social and legal perspectives. Extensive list of books, articles and cases on this subject contained in the appendix); L. Walker, *The Battered Woman* (1979); Buda & Butler, *The Battered Wife Syndrome, A Back Door Assault On Domestic Violence,* 23 J.Fam.L. 359 (1984–85); Crocker, *The Meaning of Equality For Battered Women Who Kill Men In Self-Defense,* 8 Harv.Women's L.J. 121 (1985); Rosen, *The Excuse Of Self-Defense: Correcting A Historical Accident On Behalf Of Battered Women Who Kill,* 36 Am.U.L.Rev. 11 (1986); Note, *Defense Strategies For Battered Women Who Assault Their Mates;* State v. Curry, 4 Harv. Women's L.J. 161 (1981); Note, *The Battered Wife's Dilemma: To Kill Or To Be Killed,* 32 Hastings L.J. 895 (1981); Comment, *The Defense Of Battered Women*

---

**2.** The Supreme Court of Ohio held this year in *Koss* that expert testimony on the battered woman syndrome is admissible to prove the defense of self-defense. Petitioner concedes, however, that nothing in *Koss* suggests that the new state evidentiary rule could be applied retroactively to petitioner's case. Petitioner's memorandum on impact of *State v. Koss,* p. ——.

*Who Kill,* 135 U.Pa.L.Rev. 427 (1987) (advocating use of insanity defense). The majority of the material written on this subject advocates the admissibility of expert testimony on the battered woman syndrome. *But see* Acker & Toch, *Battered Women, Straw Men, And Expert Testimony: A Comment On* State v. Kelly, 21 Crim.L.Bull. 125 (1985); Note, *The Battered Woman Syndrome And Self–Defense: A Legal And Emperical Dissent,* 72 Va.L.Rev. 619 (1986); Note, *Does Wife Abuse Justify Homicide?,* 24 Wayne L.Rev. 1705 (1978); *see generally* Comment, *Human Biology And Criminal Responsibility: Free Will or Free Ride?,* 137 U.Pa.L.Rev. 615 (1988).

In addition to the Supreme Court of Ohio, a number of other state appellate courts have addressed the issue of the admissibility of expert testimony on the battered woman syndrome. The following state appellate courts have held that expert testimony on the battered woman syndrome is admissible to prove self-defense. *People v. Aris,* 215 Cal.App.3d 1178, 264 Cal.Rptr. 167 (1989); *Ibn–Tamas v. United States,* 407 A.2d 626 (D.C.1979) (*cf. Ibn–Tamas v. United States,* 455 A.2d 893 (D.C.1983)); *Hawthorne v. State,* 408 So.2d 801 (Fla.Ct.App.1982); *Chapman v. State,* 258 Ga. 214, 367 S.E.2d 541 (1988); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (1981); *People v. Minnis,* 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Hodges,* 239 Kan. 63, 716 P.2d 563 (1986), *over'd on other grounds, State v. Stewart,* 243 Kan. 639, 763 P.2d 572 (1988); *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985); *Commonwealth v. Rose,* 725 S.W.2d 588 (Ky.1987), *over'd in part, Commonwealth v. Craig,* 783 S.W.2d 387 (1990); *State v. Anaya,* 438 A.2d 892 (Me. 1981); *State v. Hennum,* 441 N.W.2d 793 (Minn.1989); *State v. Williams,* 787 S.W.2d 308 (1990); *State v. Clay,* 779 S.W.2d 673 (Mo.App.1989) (recognizing expert testimony admissible under statute); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (1984); *State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (1986); *People v. Torres,* 128 Misc.2d 129, 488 N.Y.S.2d 358 (1985); *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983); *State v.*

*Moore,* 72 Ore.App. 454, 695 P.2d 985 (1985); *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989); *State v. Hill,* 287 S.C. 398, 339 S.E.2d 121 (1986); *State v. Furlough,* 1990 WL 40068, 1990 Tenn. Crim.App. LEXIS 293 (Apr. 10, 1990); *Fielder v. Texas,* 756 S.W.2d 309 (1988); *State v. Ciskie,* 110 Wash.2d 263, 751 P.2d 1165 (1988); *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312 (1984); *State v. Steele,* 359 S.E.2d 558 (W.Va.1987). A number of state appellate courts have held such testimony to be inadmissible. *Hill v. State,* 507 So.2d 554 (Ala.1986) (dicta); *Fultz v. State,* 439 N.E.2d 659 (Ind.App.1982) (court of appeals upheld trial court's refusal to admit expert testimony on facts of particular case; does not appear to establish *per se* rule); *State v. Necaise,* 466 So.2d 660 (La. App.1985); *State v. Felton,* 106 Wis.2d 769, 318 N.W.2d 25 (App.1981), *aff'd in part, rev'd in part,* 110 Wis.2d 485, 329 N.W.2d 161 (1983); *Buhrle v. State,* 627 P.2d 1374 (Wyo.1981). Clearly, both the majority position and the trend among state appellate courts favors the admissibility of expert testimony on the battered woman syndrome. *See generally* Annotation, *Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Woman Syndrome,* 18 A.L.R.4th 1153 (1982).

State Courts have approached the issue of admissibility as a state evidentiary law question rather than a constitutional issue. This Court is aware of only two reported state court decisions on this subject that even make reference to the constitutional implications of this issue, and in both cases the references to constitutional law were made only in passing. *See State v. Necaise,* 466 So.2d at 665; *State v. Kelly,* 97 N.J. at 202–03 n. 11, 478 A.2d at 376.

Although the aforementioned authorities are helpful in gaining an understanding of the general subject of the battered woman syndrome, they do not provide much guidance for the determination of the issue presently before this Court. The aforementioned authorities address admissibility under state law. The issue before this Court, however, is whether the trial court constitutionally was required to admit the

proffered expert testimony on the battered woman syndrome at petitioner's trial.

### B. The Battered Woman Syndrome.

Before proceeding further, a brief description of the battered woman syndrome is in order:

> The "battered woman syndrome" generally refers to common characteristics appearing in women who are physically and psychologically abused by their mates. The typical pattern of violence consists of three recurrent phases of abuse: a tension-building stage, characterized by minor abuse; an acute battering stage, characterized by uncontrollable explosions of brutal violence; and a loving respite stage, characterized by calm and loving behavior of the batterer, coupled with pleas for forgiveness. The continued cycle of violence and contrition results in the battered woman living in a state of learned helplessness. Because she is financially dependent on the batterer, she may feel partly responsible for the batterer's violence, she may believe that her children need a father, or fear reprisal if she leaves. The battered woman lives with constant fear, coupled with a perceived inability to escape. Eventually, she comes to believe that her only options are enduring the abuse, striking back, or committing suicide.

*Fennell v. Goolsby*, 630 F.Supp. 451, 456 (E.D.Pa.1985). Proponents of the battered woman syndrome defense essentially maintain that women suffering from the syndrome are in a constant state of fear and as a result reasonably perceive that they are in danger even when their battering partners are in a passive stage. Proponents assert that expert testimony is essential to a battered woman's defense because the average juror does not understand why a battered woman perceives she is in danger when her battering partner is in a passive or contrite stage, and because concepts such as "learned helplessness" are beyond the ken of most jurors. Proponents also complain that jurors, and society in general, suffer from various misconceptions or prejudices concerning battered

women, such as that battered women deserve or take pleasure in being abused.

How expert testimony on the battered woman syndrome would be used at trial to help establish the defense of self-defense should also be examined. Under Ohio law, to establish self-defense a criminal defendant must prove the following by a preponderance of the evidence:

> (1) The slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a *bona fide* belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger.

*State of Ohio v. Tourlakis*, No. 52035 (Cuyahoga Cty. App. Apr. 25, 1987) at 6 (quoting *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979) (syllabus by the court, paragraph two)). "Ohio employs a subjective test to determine whether a defendant had a *bona fide* belief in imminent danger." *Id.* (citing *State v. Sheets*, 115 Ohio St. 308, 152 N.E. 664 (1926)).

In general, expert testimony on the battered woman syndrome would be used to establish self-defense in two ways. First, it ostensibly would provide a reason for the battered woman's perception that she was in imminent danger in spite of the fact that her battering partner was passive at the time of the offense. Second, the theory of learned helplessness would provide an explanation for why the battered woman resorted to deadly force rather than attempting to escape from or otherwise avoid the perceived danger.

### C. Applicable Constitutional Standards.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as

well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). In *Washington v. Texas,* the Court struck down a Texas law that prohibited co-participants in the same crime from testifying for one another. Under the compulsory process clause of the Sixth Amendment, as applicable to the states through the due process clause of the Fourteenth Amendment, the Court in *Washington v. Texas* held that a state may not arbitrarily prevent a criminal defendant from introducing testimony by a witness who is physically and mentally capable of testifying to events that he personally observed, and whose testimony is relevant and material to the defense. 388 U.S. at 23, 87 S.Ct. at 1925. More recently, under the same principles, the Court held unconstitutional an Arkansas rule that prohibited a criminal defendant from introducing her own hypnotically-enhanced testimony. *Rock v. Arkansas,* 483 U.S. 44, 52, 62, 107 S.Ct. 2704, 2709, 2714–15, 97 L.Ed.2d 37 (1987). Stated succinctly, "'The Sixth Amendment does not operate to prevent a state from adopting any limitations on defense evidence in criminal trials, but only prevents the adoption of broad arbitrary limitations.'" *Fennell v. Goolsby,* 630 F.Supp. 451, 461 (E.D.Pa.1985) (quoting *Myers v. Frye,* 401 F.2d 18, 21 (7th Cir.1968)).

The right to present relevant testimony is not without limitation. *Id.* 483 U.S. at 55, 107 S.Ct. at 2711; *Allen v. Morris,* 845 F.2d at 1614. For example, the right "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas,* 483 U.S. at 55, 107 S.Ct. at 2711 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297 (1973)). In the realm of expert testimony, a criminal defendant is not constitutionally entitled to introduce an expert's conclusion

that the criminal defendant acted in self-defense. *Phillips v. Wainwright,* 624 F.2d 585, 590 (5th Cir.1980). On the other hand, at least one court of appeals has held unconstitutional a trial court's refusal to permit expert testimony on "homosexual panic" in order to explain the defendant's state of mind in a murder case. *Parisie v. Greer,* 671 F.2d 1011 (7th Cir.1982), *vacated on other grounds,* 705 F.2d 882 (7th Cir.1983), *cert. denied,* 464 U.S. 950, 104 S.Ct. 366, 78 L.Ed.2d 326 (1983).

Recently, the Sixth Circuit held that a state court's exclusion of expert testimony on the subject of eyewitness identification did not violate the defendant's constitutional rights. *Moore v. Tate,* 882 F.2d 1107, 1111 (6th Cir.1989). Interestingly, like the battered woman syndrome, the notion that eyewitness identification testimony is inherently unreliable is based, in part, on scientific study. *See* Black, *A Unified Theory Of Scientific Evidence,* 56 Fordham Law Rev. 595, 655 (1988); Note, *Did Your Eyes Deceive You? Expert Psychological Testimony On The Unreliability Of Eyewitness Identication,* 29 Stan. L. Rev. 969, 974–89 (1977). Some of the other parallels between *Moore* and the instant case are striking. Like self-defense, misidentification is a defense firmly rooted in our society's concept of justice, inasmuch as the conviction and imprisonment of an innocent person as a result of misidentification would be universally condemned as unjust. Many jurors afford eyewitness identification testimony greater weight than they should, according to the scientific studies on this subject. Moreover, the reasons why eyewitness identification testimony may be inherently unreliable arguably are beyond the ken of the average juror. Additionally, expert testimony on the unreliability of eyewitness identification undoubtedly would result in a stronger misidentification defense. Nevertheless, under *Moore,* a criminal defendant does not have a constitutional right to introduce expert testimony on the subject. The state's interest in developing its own rules prevails.

It is also appropriate in this case to consider the state's right to determine what

constitutes punishable behavior and exculpatory circumstances. If a state has legitimately determined the existence of a certain set of circumstances is not exculpatory, then evidence of such circumstances is rendered irrelevant.

It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, *Irvine v. California*, 347 U.S. 128, 134 [74 S.Ct. 381, 384, 98 L.Ed. 561] (1954) (plurality opinion), and we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally "within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Speiser v. Randall*, 357 U.S. 513, 523, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958).

*Patterson v. New York*, 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977). *See also McMillan v. Pennsylvania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986); *White v. Arn*, 788 F.2d 338, 347 n. 15 (6th Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1370, 94 L.Ed.2d 686 (1987). Although *Patterson* involved the allocation of the burden of proof, the general principle that dealing with crime, including determining what constitutes crime and exculpatory circumstances, is much more the business of the states is applicable in this case. The federal courts should not lightly intrude upon the states' inherent right to make such determinations.

Aside from these general principles, this Court has found only two federal court decisions that squarely address the question of whether a state court's refusal to admit expert testimony on the battered woman syndrome amounts to constitutional error. *See Fennell v. Goolsby*, 630 F.Supp. 451 (E.D.Pa.1985); *Thomas v. Arn*, 728

F.2d 813, 815 (6th Cir.1984), *aff'd*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (concurring opinion by Jones, J.). The district court in *Fennell* held that the exclusion of expert testimony on the battered woman syndrome did not violate the defendant's Sixth Amendment or due process rights because the expert's testimony was "not of a fact witness to the crime, but of an expert on petitioner's mental state." 630 F.Supp. at 460. The court in *Fennell* drew a distinction between "fact witnesses" and "expert testimony" based upon its interpretation of *Washington v. Texas, supra*, which, as previously stated, involved the exclusion of eyewitness testimony to the crime. The court in *Fennell* held in the alternative that even if the exclusion of the expert testimony on the battered woman syndrome was constitutional error, the error was harmless beyond a reasonable doubt. 630 F.Supp. at 461. The *Fennell* court found the exclusion to be harmless because the history of the defendant's abuse by her husband had been brought before the jury and the jury was therefore free to draw inferences concerning the effect of the abuse on the defendant's behavior. "Thus, the jury was not denied testimony of essential facts but an expert's explanation of those facts." *Id.*

The other federal opinion on this subject is contained in the Honorable Nathanial R. Jones's concurring opinion in *Thomas v. Arn, supra*. In *Thomas v. Arn*, the majority did not consider the merits of the petitioner's case because the petitioner failed timely to object to the magistrate's report and recommendation. However, Judge Jones wrote separately

to note that if I were to reach the merits of this case, I would grant the writ of habeas corpus. In my view, the trial court's exclusion of expert testimony on the "battered wife syndrome" impuned the fundamental fairness of the trial process thereby depriving Thomas of her constitutional right to a fair trial.

*Thomas v. Arn*, 728 F.2d at 815 (concurring opinion by Jones, J.). Judge Jones further stated "[t]he law cannot be allowed to be mired in antiquated notions about

human responses when a body of knowledge is available which is capable of providing insight. *Id.*

Petitioner specifically relies upon Judge Jones's concurring opinion in *Thomas v. Arn* for the proposition that the exclusion of the expert testimony on the battered woman syndrome violated her right to a fair trial. Although Judge Jones's comments represent the view of a highly respected member of the Sixth Circuit, they are nevertheless dicta and were not joined in by the other members of the panel. This Court concludes that the best indication of the Sixth Circuit view on this issue is its recent holding in the closely analogous case of *Moore v. Tate, supra.*

In her traverse filed through counsel, petitioner also argues that her rights under the compulsory process and due process clauses were violated because the excluded testimony on the battered woman syndrome was both material and favorable to the defense. In support of this proposition, petitioner cites *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) and *United States v. Davis,* 639 F.2d 239 (5th Cir.1981). The defendant in *United States v. Valenzuela–Bernal* was charged with transporting illegal aliens. The Court in *Valenzuela–Bernal* reversed the court of appeals, holding that the deportation of the allegedly illegal aliens prior to trial did not violate the defendant's rights under either the compulsory process clause of the Sixth Amendment or the due process clause of the Fourteenth Amendment. 458 U.S. at 873–74, 102 S.Ct. at 3449–50. In *Davis,* the district court excluded testimony by two character witnesses offered by the defendant to impeach the government's key witness as to his reputation for truth and veracity. The district court excluded the testimony as a sanction against the defendant for failing to provide the names of the witnesses on a witness list as required by a pretrial discovery order. The court of appeals in *Davis* reversed the district court, holding that the Sixth Amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders. 639 F.2d at 243.

This Court does not find either *Valenzuela–Bernal* or *Davis* to be supportive of petitioner's case. Neither case involves the exclusion of evidence on the basis of state evidentiary rule. The correct standard to apply in reviewing a state evidentiary rule is whether the rule arbitrarily excludes evidence that is relevant and material to the defense. *Rock v. Arkansas,* 483 U.S. at 54–55, 107 S.Ct. at 2710–11; *Washington v. Texas,* 388 U.S. at 23, 87 S.Ct. at 1925; *Myers v. Frye,* 401 F.2d at 21.

In addition, *Valenzuela–Bernal* and *Davis* do not involve the exclusion of expert testimony. The Court finds this distinction to be significant. There can be no dispute that " 'in the mind of a typical lay juror, a scientific witness has a special aura of credibility.' " *Barefoot v. Estelle,* 463 U.S. 880, 926 n. 8, 103 S.Ct. 3383, 3399 n. 8, 77 L.Ed.2d 1090 (1983) (dissenting opinion by Blackmun, J.) (quoting Imwinkelried, *Evidence Law and Tactics For the Proponents of Scientific Evidence in Scientific and Expert Evidence* 33, 37 (E. Imwinkelried ed. 1981)). For reasons such as this, "[c]ourts are generally granted far more discretion in determining the admissibility of expert testimony than of fact testimony." *Fennell v. Goolsby,* 630 F.Supp. at 460. Given these considerations, it is clear that a state ruling concerning the exclusion of scientific expert testimony should be afforded additional deference.

D.  Analysis.

■ After carefully considering the facts of the instant case, the Court concludes that the trial court's refusal to admit expert testimony on the battered woman syndrome did not result in an error of constitutional magnitude. The reason for this conclusion is twofold. First, although the Ohio rule excluding testimony on the battered woman syndrome is broad, it is not unconstitutionally arbitrary. Second, under the facts of this case, the exclusion of the disputed testimony was not constitutional error, or, even if the exclusion was constitutional error, the error was harmless beyond a reasonable doubt.

The reasoning behind the former Ohio rule excluding testimony on the battered woman syndrome is as follows:

> Expert testimony on the "battered wife syndrome" by a psychiatric social worker to support defendant's claim of self-defense is inadmissible herein because (1) it is irrelevant and immaterial to the issue of whether defendant acted in self-defense at the time of the shooting; (2) the subject of the expert testimony is within the understanding of the jury; (3) the "battered wife syndrome" is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant testimony under the guise of expertise; and (4) its prejudicial impact outweighs its probative value.

*State v. Thomas*, 66 Ohio St.2d at 521–22, 423 N.E.2d at 140.[3] The Court of Appeals in the instant case acknowledged the applicability of *State v. Thomas* to the facts of the case. *State of Ohio v. Tourlakis*, No. 52035 (Cuyahoga Cty. App. Apr. 25, 1987) at 10–11.

The reasoning behind Ohio's former rule is not arbitrary in the constitutional sense. To illustrate this point, the Court will examine each of the four reasons for the former rule stated in *State v. Thomas*.

The first reason stated in *State v. Thomas* is that expert testimony on the battered woman syndrome is "irrelevant and immaterial to the issue of whether defendant acted in self-defense at the time of the shooting." 66 Ohio St.2d at 521, 423 N.E.2d at 140. By declaring such testimony irrelevant, the Supreme Court of Ohio effectively precluded a defense based on the battered woman syndrome as explained through expert testimony under the former rule.

Although the right to present a defense is unquestionably fundamental, it cannot likewise be said that the admissibility of expert testimony on the battered woman syndrome was, at the time of petitioner's trial, a principle of justice rooted in the

traditions and conscience of our people. Even if the battered woman syndrome has since become generally accepted by the scientific community, the question of whether the syndrome constitutes a legitimate defense is not scientific, but legal.

Whether a battered woman's actions should be deemed "justified" or "excused" raises moral and social issues that cannot be answered by administering tests and analyzing data. *See State v. Norman*, 324 N.C. 253, 264–66, 378 S.E.2d 8, 15–16 (1989). Simply because behavior can be scientifically described and associated with a certain cause, in this case abuse, does not mean that society is constitutionally required to excuse that behavior when it otherwise is violative of the law. In weighing the State of Ohio's legitimate interest in deterring and punishing behavior involving death and injury to its citizens against the arguments in favor of allowing expert testimony on the battered woman syndrome to be used to establish self-defense, the Supreme Court of Ohio in 1981 apparently determined that the defense of self-defense should not be extended to include a defense based upon such expert testimony. That there may have been good arguments in favor of the admissibility of expert testimony on the battered woman syndrome at that time does not render the Supreme Court of Ohio's determination irrational or arbitrary. This Court believes that reasonable minds could differ on the question of whether, in light of the battered woman syndrome, battered women's actions in killing or attempting to kill their battering partners should be deemed legally justified or excused. For this reason, the first reason stated in *State v. Thomas* is not unconstitutionally arbitrary.

The second reason stated in *State v. Thomas* is that the subject of the expert testimony, the experiences and perceptions of the battered woman, is within the understanding of the jury. Significantly, in

---

**3.** Expert testimony on the battered woman syndrome is now admissible in Ohio to prove the defense of self-defense under *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990). Curiously, *Koss* only addresses the third reason stated

in *State v. Thomas*, concluding that the battered woman syndrome is now a matter of commonly accepted scientific knowledge. *See State v. Koss*, 49 Ohio St.3d at 217, 551 N.E.2d at 974.

Ohio, "the victim's reputation for violence as known by the defendant is admissible to support a claim of self-defense." *State of Ohio v. Tourlakis*, No. 52035 (Cuyahoga Cty. App. Apr. 25, 1987) at 6 (citing *McGaw v. State*, 123 Ohio St. 196, 174 N.E. 741 (1931); *State v. Smith*, 10 Ohio App.3d 99, 460 N.E.2d 693 (1983)). Evidence of the victim's character may be proved by specific instances of the victim's conduct. *Id.* at 6–7 (citing Rules 404(A)(2) and 405(B), Ohio Rules of Evidence). Under the former rule, therefore, a battered woman defendant in Ohio was able to introduce evidence of past episodes of battering to establish a pattern of abuse. Petitioner was allowed to do this. Nothing in the former rule suggests that a defendant would have been precluded from testifying as to her own perceptions that she subjectively perceived inescapable, imminent danger. There is also nothing about the former rule to suggest that a battered woman would have been precluded from explaining the reasons why she used force rather than leave her battering partner. It is far from self-evident that a factfinder, having heard such evidence, would have been unable to understand that a woman who experienced frequent serious physical abuse may have had a *bona fide* subjective belief that she was in inescapable danger of further abuse even when her battering partner was outwardly passive. For these reasons, the second reason stated in *State v. Thomas*, is not unconstitutionally arbitrary.

The third reason stated for the decision in *State v. Thomas* is that the battered woman syndrome was not sufficiently developed as a matter of commonly accepted scientific knowledge to warrant expert testimony on the subject. The State of Ohio has an undeniably legitimate interest in ensuring that scientific expert testimony not be admitted in criminal trials unless the testimony is based upon a sufficiently developed, well-recognized body of scientific knowledge. This Court believes that the states should be afforded some discretion in determining whether, under the state's standards, a particular theory upon which a proposed expert offers to testify is sufficiently developed so as to warrant admis-

sion of the testimony based on the theory. *See* Note, *The Battered Woman Syndrome And Self-Defense: A Legal And Emperical Dissent*, 72 Va.L.Rev. 619, 636–643 (1986) (pointing out several potential flaws in scientific research on the battered woman syndrome). This Court cannot fault the Supreme Court of Ohio for failing to adopt a theory in 1981 where the leading proponent of the theory published her major work on the subject only two years earlier. *See* L. Walker, *The Battered Woman* (1979). The Court similarly does not find to be arbitrary the Ohio courts' refusal to depart from the rule several years later in the instant case.

The fourth and final reason for excluding expert testimony on the battered woman syndrome stated in *State v. Thomas* is that the prejudicial impact of such testimony outweighed its probative value. The Supreme Court of Ohio explained "we believe the expert testimony offered here would tend to stereotype defendant, causing the jury to become prejudiced. It could decide the facts based on typical, and not the actual, facts." 66 Ohio St.2d at 521, 423 N.E.2d at 140. The following observations have been made concerning the use of expert testimony in criminal cases:

There can be no dispute about this obvious proposition:

"Scientific evidence impresses lay jurors. They tend to assume it is more accurate and objective than lay testimony. A juror who thinks of scientific evidence visualizes instruments capable of amazingly precise measurement, of findings arrived at by dispassionate scientific tests. In short, in the mind of the typical lay juror, a scientific witness has a special aura of credibility." Imwinkelried, *Evidence Law And Tactics For The Proponents Of Scientific Evidence In Scientific And Expert Evidence* 33, 37 (E. Imwinkelried ed. 1981).

*Barefoot v. Estelle*, 463 U.S. 880, 926 n. 8, 103 S.Ct. 3383, 3412 n. 8, 77 L.Ed.2d 1090 (1983) (dissenting opinion by Blackmun, J.). " 'The major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the

evidence and thus lead the jury to accept it without critical scrutiny.' " *Id.* at 926, 103 S.Ct. at 3412 (quoting Ginnelli, *The Admissibility Of Novel Scientific Evidence: Frye v. United States, A Half–Century Later,* 80 Colum.L.Rev. 1197, 1237 (1980)). *See also United States v. Anderson,* 851 F.2d 384, 393 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989); *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973). Although *Barefoot* and *Anderson* addressed the prejudicial impact of expert testimony offered against the accused, the same "obvious proposition" would apply where a criminal defendant seeks to offer expert testimony in support of a defense. *See United States v. Amaral,* 488 F.2d at 1152. In light of this proposition, the Supreme Court of Ohio's concern that the prejudicial impact of expert testimony on the battered woman syndrome would outweigh its probative value is not unconstitutionally arbitrary.

If any of the four reasons stated in *State v. Thomas* constitute an adequate state ground for excluding expert testimony on the battered woman syndrome, then the former rule is not unconstitutional. Based on the foregoing discussion, this Court finds each of the four reasons given by the Supreme Court of Ohio in *State v. Thomas* to be sufficiently compelling so as to preclude a conclusion that Ohio's former rule is unconstitutional.

■ This Court's decision is also based upon a determination that under the facts of this case, the exclusion of expert testimony on the battered woman syndrome was not constitutional error. The testimony excluded was not that of a "key fact witness" who actually observed the crime. Rather, petitioner's expert would have testified as to petitioner's state of mind, and, presumably, on the ultimate issue of whether petitioner perceived she was in immediate danger at the time of the shooting. The Constitution does not require that such testimony be admitted. *See Fennell v. Goolsby,* 630 F.Supp. at 460–61.

Further, petitioner was able to introduce a significant amount of evidence of her prior abuse by the victim, in spite of the fact that the trial court sustained numerous objections by the prosecutor to the introduction of such evidence. For example, petitioner was allowed to testify that at one point the victim put his hands around her throat and threatened to kill her. (Tr. p. 341). Petitioner was also allowed to testify as to another death threat during which the victim held a razor to petitioner's throat, telling her that "he was going to cut my body so no one else could look at me and he would break my legs." (Tr. p. 343). Petitioner additionally was able to introduce testimony by other witnesses as to Sparks' general reputation for violence and jealousy as well as testimony corroborating petitioner's assertion that Sparks tried to choke her and on at least one occasion held a knife to her. Therefore, as in *Fennell,* the fact-finder was not denied testimony of the essential facts but rather an expert's explanation of those facts. *See Fennell v. Goolsby,* 630 F.Supp. at 461. For these reasons, even if the exclusion of the expert testimony on the battered woman syndrome was constitutional error, the error was harmless beyond a reasonable doubt.

WHEREUPON, the Court HOLDS that the petition is without merit. Accordingly, the petition is DENIED, and this action is hereby DISMISSED.